# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BENJAMIN B. CRENTSIL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 16-40030-TSH** |
| STATE HEALTHCARE & RESEARCH | ) | |
| EMPLOYEES, et al. | ) | |
| Defendants. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### September 26, 2017

Hennessy, M.J.

By Order of Reference dated April 18, 2017, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #55), this matter was referred to me for a report and recommendation on the motion for summary judgment filed by Defendant State Healthcare and Research Employees ("SHARE") (Docket #40) and the motion for summary judgment filed by Defendant UMass Memorial Medical Center ("UMass Memorial") (Docket #46). Plaintiff Benjamin Crentsil filed a joint opposition on March 31, 2017. (Docket #51). SHARE filed a reply to the opposition on April 5, 2017 (Docket #52) and UMass Memorial filed a reply on April 11, 2017. (Docket #53). On April 14, 2017, Crentsil filed an affidavit in support of his opposition. (Docket #54). UMass Memorial moved to strike this affidavit on May 4, 2017. (Docket #56). Crentsil responded to the motion on May 17, 2017. (Docket #57). The motion to strike was referred to me on May 26, 2017 for a ruling pursuant to 28 U.S.C. § 636(b)(1)(A). (Docket #58). A hearing on the pending motions was held on August 2, 2017. (Docket #62). This matter is now ripe for adjudication. For the reasons that follow, I

RECOMMEND that the motion for summary judgment filed by SHARE (Docket #40) be ALLOWED and the motion for summary judgment filed by UMass Memorial (Docket #46) be ALLOWED, and ORDER that UMass Memorial's motion to strike (Docket #56) be ALLOWED to the extent described in this order.

I.      BACKGROUND[1]

On October 1, 2007, Crentsil was hired as a Patient Care Associate ("PCA") by UMass Memorial.  (UMMF 1-2).[2]  As a PCA, Crenstil was responsible for assisting patients with daily living activities such as personal hygiene, ambulating, meals and nourishment; assisting licensed healthcare providers with treatments and procedures; providing the patient with emotional support; maintaining patient safety by performing patient safety checks and utilizing fall prevention strategies as directed; and providing clear, timely communication to the licensed healthcare providers.  (UMMF 4).

Crentsil applied for a position on the Surgical Transplant Unit ("STU") in the fall of 2011. (UMMF 23).  On October 21, 2011, Lorna Wilson, the Nurse Manager for the STU, reported to Crentsil's supervisor at the time, Jeffrey Merida, that, after she did not select Crentsil for a position on the STU, Crentsil called her "multiple times demanding to know why he doesn't have [the] position," that he showed up at the Unit demanding to speak with Wilson, and he was "very aggressive."  (Id.).  As a result of Wilson's complaint, Crentsil received documented counseling

---

[1] Local Rule 56.1 provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried[.]"  "A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  Id.  Both SHARE and UMass Memorial complied with their obligations under this rule.  (See Dockets #43, 48).  Crentsil, however, failed to file a statement of facts controverting those alleged by the defendants.  Therefore, pursuant to Local Rule 56.1, the material facts of record set forth by the defendants are deemed admitted for purposes of this motion.

[2] The term "UMMF" refers to UMass Memorial's facts, which can be found in their Statement of Undisputed Material Facts.  (Docket #48).  The term "SF" refers to SHARE's facts, which can be found in their Statement of Undisputed Material Facts.  (Docket #43).

for "rudeness to customers/coworkers" on November 1, 2011, which noted that Crentsil was "perceived to be aggressive and confrontational towards [Wilson] after being interviewed for a position but not chosen for the job." (UMMF 24).

Crentsil laterally transferred to the position of PCA I in the Bone Marrow Transplant Unit ("BMTU") on November 30, 2011. (UMMF 3). As a PCA in the BMTU, Crentsil was directed by, and responsible for, assisting the BMTU's registered nurses. (UMMF 5).

On April 24, 2012, Deborah Pressey, a nurse in the BMTU, reported to Crentsil's manager at the time, Catherine Buell, that Crentsil did not take direction well, had to have requests for tasks repeated, did not perform requested duties in a timely fashion, was mildly insolent at times, and seemed annoyed when something was requested of him. (UMMF 27; Docket #48-1 at 61).

On August 21, 2014, Crentsil made a complaint to Marcia Bowles, UMass Memorial's Equal Employment Opportunity Compliance Manager, stating that Laurie Budnick, a nurse in the BMTU, had reported him for taking a lunch break and that he felt that Budnick was targeting and discriminating against him because of his race. (UMMF 34-35). Crentsil is black and from the country of Ghana. (UMMF 10, 13). The next day, Bowles met with Crentsil and his union representative, Deb Engvall. (UMMF 36). Engvall is a representative of SHARE, the union which exclusively represented Crentsil for purposes of collective bargaining during his employment with UMass Memorial. (SF 3, 8). Crentsil told Bowles that, on August 12, 2014, Budnick reported him to Lisa O'Connell, Nurse Manager of the BMTU, for taking a thirty-minute break, although Budnick had pre-approved the break. (UMMF 36). Crentsil stated that he had never had any prior discipline. (Id.).

On September 5, 2014, Bowles interviewed Merida concerning Crentsil's complaint. (UMMF 37). Merida informed Bowles that he was covering for O'Connell on August 12, 2014.

(UMMF 38).  He stated that Budnick was the resource nurse that day, and, as the resource nurse, she was responsible for managing staff break periods.  (Id.).  Merida informed Bowles that Crentsil "was not reported or disciplined for taking a lunch break."  (Id.).  Bowles interviewed Budnick on September 17, 2014.  (UMMF 37).  Budnick denied that she had reported Crentsil for taking a break.  (UMMF 39).  On September 24, 2014, Bowles informed Crentsil that there was "no evidence that his allegations or problems are the result of racial discrimination."  (UMMF 40).

On June 20, 2015, Budnick reported that Crentsil was not properly caring for a patient who was a fall risk.  (UMMF 6, 29).  Budnick stated that when she asked Crentsil to properly assist the patient, Crentsil "stared, and gave no response" to Budnick.  (UMMF 29).  When Budnick again asked Crentsil to properly assist the patient, he "did nothing to ensure [patient] safety."  (Id.).  Budnick reported that Crentsil then refused to care for the patient by putting paste on the patient's sores and "flippantly stated, in front of the patient – 'she pee'd.'"  (Id.).  The next day, Budnick emailed O'Connell and reported that Crentsil shoved screening forms at the nurses and that she found "him more and more rude, unapproachable, and extremely disrespectful."  (UMMF 30).  O'Connell spoke to Crentsil on June 23, 2015 about the incident reported by Budnick.  (UMMF 31).  Crentsil told O'Connell that he "did not feel like he needed to be told by [Budnick] about the fall risk.  (Id.).  O'Connell explained to Crentsil that he needed to "make eye contact and verbal response when spoken to by any other person."  (Id.).

On July 22, 2015, UMass Memorial received three reports regarding Crentsil's care of a patient referred to as "Patient Doe."  (UMMF 43).  Budnick reported that Patient Doe complained to her that Crentsil had "practically ripped off [his] hemorrhoids" and "purposefully dropped the call light on [his] stomach."  (UMMF 44).  Anne Martell, a nurse in the BMTU, stated that Patient Doe reported to her that he was upset regarding Crentsil's evening care, and that Crentsil had

4

merely stood and watched Patient Doe clean himself and would not help Patient Doe.  (UMMF 45).  Cheryl Troy, a nurse in the BMTU, reported that Patient Doe told her that Crentsil said to him "you're always a mess like this" in reference to the patient leaking from a rectal tube.  (UMMF 46).  There was no one else in Patient Doe's room besides Crentsil and Patient Doe during the time of these alleged incidents.  (SF 36).

Christine Hiza, Human Resources Business Partner, and O'Connell met with Martell, Troy, and Budnick separately on July 22, 2015 regarding their reports.  (UMMF 5, 48).  In her meeting with Hiza and O'Connell, Martell confirmed her report and stated that Patient Doe reported his concerns to her about Crentsil on July 10, 2015.  (UMMF 50).  Martell stated that Patient Doe had informed her that he feared retaliation from Crentsil.  (Id.).  Martell noted that Crentsil frequently failed to do what nurses asked him to do.  (Id.).  Martell also informed Hiza and O'Connell that Crentsil had belittled Kim Schwartz, another PCA, in front of a patient, and that she thought this was bullying behavior.  (UMMF 53).  During her meeting with Hiza and O'Connell, Troy also confirmed her report, indicating that Patient Doe repeated his concerns to her about Crentsil on July 12, 13, and 14, 2015.  (UMMF 51).  Troy stated that she avoided Crentsil unless she really needed something because, when she asked him for something, he would reply in a negative tone "I'll do that later" or "I'll get to it when I can," and that he was "very disrespectful and unprofessional."  (Id.).  Budnick also confirmed her report when she met with Hiza and O'Connell, and acknowledged that she had previous issues with Crentsil.  (UMMF 52).  Budnick reported that Patient Doe was fearful of retaliation from Crentsil and that Crentsil had made Patient Doe get back into a dirty bed.  (Id.).

Susan Tarrant, UMass Memorial's Senior Director of Patient Care Services, interviewed Patient Doe on July 22, 2015.  (UMMF 47).  Patient Doe reported to Tarrant that Crentsil "cuts

everything short," "runs away from the job," and makes it seem to the patient that he is a "burden." (Id.).  Patient Doe also stated that Crentsil "seems to know you need something and then leave[s] it out of reach.  If [the patient] need[s] something[,] [he] is at [Crentsil's] disposal . . . his mercy." (Id.).  Patient Doe gave several examples illustrating how Crentsil cut his job short.  (Id.).

UMass Memorial placed Crentsil on administrative leave that day.  (UMMF 49).

On July 23, 2015, Hiza, O'Connell, and Judy O'Donnell, Clinical Coordinator, met with Schwartz.  (UMMF 54).  Schwartz reported that prior to shift change one day, she told Crentsil that two patients had not showered.  (Id.).  Schwartz stated that Crentsil brought her into the patient's room and was rude and condescending to the patient, and that he used an inappropriate tone when telling the patient to take a shower.  (Id.).  Hiza, O'Connell, and O'Donnell also met again with Martell that same day.  (Docket #48-1 at 77).  Martell reported that she had witnessed Schwartz crying as a result of this interaction with Crentsil.  (UMMF 53).

Hiza and O'Connell met with Crentsil, accompanied by Engvall, on July 28, 2015. (UMMF 36, 55).  Crentsil was able to tell his complete side of the story, denying that he had taken any of the actions complained of by Patient Doe or Schwartz.  (SF 10, UMMF 55).  UMass Memorial was very concerned that Crentsil did not express any remorse or compassion for his effect on the patient's feelings, in addition to his failure to respond in a manner typical of a caregiver.  (UMMF 55).

On August 12, 2015, Engvall met with Mary Burns, a UMass Memorial human resources manager, to discuss Crentsil's case.  (SF 11).  Engvall argued that Crentsil should be allowed to keep his job.  (Id.).  Burns stated "that won't happen," and offered Crentsil a severance package of six weeks' pay.  (Id.).  Crentsil notified Engvall on August 14, 2015, that two nurses had written letters to management in his favor.  (SF 12).  Engvall raised these letters with UMass Memorial,

but was told that this would not change the decision.[3] (Id.).  Engvall notified Crentsil of this fact. (Id.).  By email on August 15, 2015, Engvall tried to convince Hiza to only suspend Crentsil and inquired about the possibility that the patient's perception was flawed due to medication or chemotherapy.  (SF 13).

On August 17, 2015, Burns and Chuck Chalupka, the Director of Labor & Employee Relations, met with Crentsil and Engvall to inform them that UMass Memorial had concluded that the complaints regarding Crentsil's behavior and care of Patient Doe were credible and that, based on those conclusions, UMass Memorial had decided to terminate Crentsil's employment.  (UMMF 58).  The decision to terminate Crentsil had been made by O'Connell, Hiza, Burns, and Chalupka. (UMMF 57).

Crentsil informed Engvall that he would accept the UMass Memorial severance package on August 17, 2015, and Engvall conveyed this acceptance to UMass Memorial.  (SF 14).  Despite Engvall informing Crentsil that she had conveyed his acceptance to management, Crentsil rescinded his acceptance of the offer the next day.  (Id.).  Crentsil then requested additional time to accept the offer; Crentsil was given to September 10, 2015 to make a decision.  (SF 15-16).

On September 10, 2015, Engvall informed Crentsil, who had not signed the severance agreement, that UMass Memorial had indicated Crentsil would be terminated.  (SF 16).  Crentsil received a letter from UMass Memorial on September 14, 2015, terminating him as of August 20, 2015.  (SF 18,).

At the time he was terminated, Crentsil was subject to a collective bargaining agreement (the "CBA") between SHARE and UMass Memorial.  (SF 4).  The CBA's arbitration provision, entitled "Solving Problems at Work," provided that the SHARE Executive Board (the "E-Board")

---

[3] Crentsil has never seen the contents of these letters.  (SF 38).  While Engvall did request copies of the letters, UMass Memorial refused to give them to her, stating they were confidential.  (Id.).

makes the determination on whether a case should be sent to mediation or arbitration, or whether not to proceed.  (Id.).  The E-Board met on November 4, 2015 to discuss whether to submit Crentsil's termination to arbitration.  (SF 20).  In making a determination on whether to advance a case to arbitration, the E-Board considers three questions:  (1) is the case important; (2) is SHARE in the right; and (3) can SHARE prove its case.  (SF 21).  The E-Board considered these three questions with respect to Crentsil in light of the facts of his case and in contemplation of all sides of the story.  (SF 22).  With respect to the first question, the E-Board unanimously agreed that the case was important as it involved an employee discharge.  (SF 23).  On the second question, the E-Board had a debate about whether it was in the right.  (SF 24).  The strongest argument raised by the E-Board was that Crentsil had very limited formal discipline in his file for prior incidents.  (Id.).  As to the third question, the E-Board unanimously agreed that SHARE would be unlikely to prove Crentsil's case because of Patient Doe's compliant, which had been investigated by Tarrant.[4] (SF 25).  The E-Board decided that it would not advance Crentsil's case to arbitration.  (SF 27).

II.     STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court is "obliged to []view the record in the light most favorable to the

---

[4] The E-Board reviewed the oral summary of Tarrant's interview with Patient Doe.  (SF 26).  Due to concerns over patient privacy, SHARE representatives are not advised of the identity of patients, and, therefore cannot generally interview patients who have made complaints.  (SF 40).

nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

III.    ANALYSIS

A.    Motion to Strike

Crentsil filed an affidavit in support of his opposition to summary judgment on April 14, 2017. (Docket #54). On May 4, 2017, UMass Memorial moved to strike this affidavit, claiming that the statements contained therein directly contradicted Crentsil's deposition testimony and/or because the statements cannot be considered at summary judgment pursuant to Federal Rule of Civil Procedure 56(c) as they constitute inadmissible arguments and conclusions and/or were not based on Crentsil's personal knowledge. (Docket #56).

1.    Contradictory Statements

"When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony has changed." Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994); see Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (holding that when a plaintiff submits an affidavit that contradicts his prior deposition testimony following the filing of a motion for summary judgment, the "chronology [is] probative of the fact that the non-movant was merely attempting to create an issue of fact").

In its motion, UMass Memorial identifies four statements in Crentsil's affidavit that it claims are directly contradicted by his prior deposition testimony and, therefore, should be

stricken.  (Docket #56 at 3-4).  Crentsil fails to address two of these statements in his opposition, both of which assert that Budnick discriminated against Crentsil due to his national origin.  I agree that these statements are directly contradicted by Crentsil's deposition testimony, and therefore, they shall be struck from the affidavit.  (Compare Docket #54-1 with Docket #56-1 at 2).  I note that Crenstil has provided no explanation as to why his testimony has changed nor is there any indication that Crentsil was having trouble with his memory at the deposition.

UMass Memorial also argues that Crentsil's statement, "I further state that while employed by UMass Memorial Medical Center, I was the target of harassment, reprimand and frequent criticism especially from a nurse called Laurie Budnick," was directly contradicted by his deposition testimony.  (Docket #56 at 3).  UMass Memorial points to Crentsil's testimony that Budnick was the only UMass Memorial employee who ever treated him unfairly or disrespectfully.  (Docket #56-1 at 4, 6).  I agree that Crentsil's statement is directly contradicted by his deposition testimony but only to the extent that the statement uses the word "especially."  Therefore, the word "especially" shall be stricken from the statement.

Finally, UMass Memorial argues that Crentsil's statement, "I state this because I know that [Budnick] did not target people who are not black for the same manner of harassment," is contradicted by Crentsil's testimony that white nurses also had issues with Budnick.  (Docket #56 at 4).  I do not find that this testimony directly contradicts Crentsil's affidavit; the fact that one white nurse wrote up Budnick and that another white nurse did not like her attitude does not necessarily negate Crentsil's statement that Budnick did not target people who are not black for the same manner of harassment.[5]  (See Docket #56-1 at 9, 11, 13).

---

[5] While not contradictory to Crentsil's deposition testimony, I find that Crentsil is not competent to testify as to Budnick's actions toward all "people who are not black," and, therefore, the testimony shall be stricken for that reason.

2.     Federal Rule of Civil Procedure 56(c)

Federal Rule of Civil Procedure 56(c)(4) requires that affidavits used to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Statements in affidavits "based only on [the affiant's] own convictions or beliefs . . . must be stricken as speculative." Donato Aponte Navedo v. Nalco Chem., Inc., 848 F. Supp. 2d 171, 180 (D.P.R. 2012). Affidavits also "'may not contain arguments or conclusory assertions' that would not be admissible at trial." Fin. Res. Network, Inc. v. Brown & Brown, Inc., 867 F. Supp. 2d 153, 171 (D. Mass. 2012) (quoting Murphy v. Ford Motor Co., 170 F.R.D. 82, 85 (D. Mass. 1997)).

After reviewing the relevant case law and the statements themselves, I find that the statements identified by UMass Memorial on pages six through eight of its motion shall be stricken for the reasons outlined therein. (See Docket #56 at 6-8).

Hence, to the extent described herein, the affidavit shall be stricken.

B.     SHARE

Pursuant to section 9(a) of the National Labor Relations Act, SHARE is the exclusive bargaining representative of a unit of employees at UMass Memorial. 29 U.S.C. § 159(a). Implied in this status is the duty to represent all members fairly. Marquez v. Screen Actors Guild, 525 U.S. 33, 44 (1998). This duty extends to the grievance and arbitration procedure outlined in the CBA. See Vaca v. Sipes, 386 U.S. 171, 194 (1967) ("In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances."). In count I of his amended complaint, Crentsil asserts that SHARE violated its duty of fair representation by failing to file a grievance on his behalf. (Docket #1 at 5).

An individual employee does not have an absolute right to have his grievance taken to arbitration. Vaca, 386 U.S. at 191. "[A] union [only] breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." Marquez, 525 U.S. at 44. "In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to record evidence supporting any one or all of these elements" Morales-Vallellanes v. Potter, 339 F.3d 9, 16, (1st Cir. 2003) (quoting Griffin v. Air Line Pilots Ass'n, Int'l, 32 F.3d 1079, 1083 (7th Cir. 1994)). A court evaluating any such evidence must be "highly deferential" to the union. Id. (quoting Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 78 (1991). Crentsil alleges that SHARE acted both arbitrarily and discriminatorily in not contesting his dismissal. (Docket #51 at 8).

1.      Arbitrary Action

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." O'Neill, 499 U.S. at 67 (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). Crentsil argues that SHARE acted arbitrarily by failing, prior to deciding not to contest his dismissal, to adequately investigate his grievance. (Docket #43-5 at 4). Crentsil asserts that, pursuant to its duty of fair representation, SHARE was required to interview his co-workers, consider letters written in his support by other nurses, and attempt to interview Patient Doe. (Id.).

"The duty of fair representation mandates that a union conduct at least a 'minimal investigation' into an employee's grievance." Emmanuel v. Int'l Bhd. Of Teamsters, Local Union No. 25, 426 F.3d 416, 620 (1st Cir. 2005) (quoting Garcia v. Zenith Elecs. Corp., 58 F.3d 1171, 1176 (7th Cir. 1995)). "[U]nder this standard, only an 'egregious disregard for union members'

rights constitutes a breach of the union's duty' to investigate." Id. (quoting Castelli v. Douglas Aircraft Co., 752 F.2d 1480, 1483 (9th Cir. 1985)).

Crentsil first argues that SHARE should have interviewed his co-workers in order to demonstrate that UMass Memorial was lying about his abuse of Patient Doe. (Docket #43-5 at 4). However, Crentsil admits that none of his co-workers were in the room with him and Patient Doe during the alleged abuse. Nor was he aware of any particular information his co-workers could have given in his support. (SF 39). Because Crentsil has failed to demonstrate, "as he must, that any of these employees would have provided beneficial information," he cannot sustain a claim of breach of the duty of fair representation based on SHARE's failure to interview his co-workers. See Emmanuel, 426 F.3d at 420 (finding that a union's failure to interview witnesses who were not present at the time of the incident underlying plaintiff's termination did not violate duty of fair representation), quoting Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 585 (6th Cir. 1994) (stating that the failure to "present favorable evidence during the grievance process . . . may constitute a breach of . . . duty . . . only if that evidence probably would have brought about a different decision").

Crentsil also asserts that SHARE was required to consider letters written in his support by other nurses. (Docket #43-5 at 4). Yet the facts clearly demonstrate that SHARE did attempt to view these letters but was prevented from doing so by UMass Memorial. Additionally, Crentsil has failed to make the required showing that these letters would have provided information beneficial to his position. See Emmanuel, 426 F.3d at 420.

Finally, Crentsil argues that SHARE should have interviewed Patient Doe, which he claims would have demonstrated that UMass Memorial was lying about the alleged abuse. (Docket #43-5 at 4). SHARE asserts that it did not interview Patient Doe because it is not generally privy to

13

the identity of patients due to patient privacy concerns.  (See Docket #41 at 12) (citing Mass. Gen. Laws ch. 111, §§ 70E(b) and (j) (guaranteeing patients of a hospital confidentiality of all records and communications to extent provided by law and to privacy during rendering of care within the capacity of the hospital)).  Instead, SHARE relied on Tarrant's interview of Patient Doe.  Crentsil does not dispute SHARE's asserted need to respect patient privacy rights, and, in light of these important rights, the undersigned finds that SHARE's reliance on Tarrant's interview with Patient Doe was rational and, hence, not arbitrary.  See O'Neill, 499 U.S. at 67.  I note that SHARE did question UMass Memorial about Patient Doe's credibility, raising the possibility that Patient Doe's perception of the event might have been altered due to the influence of medication or chemotherapy.  (SF 40; Docket #44 at 6).

For these reasons, I recommend that the Court find that SHARE's investigation of Crentsil's claim did not violate SHARE's duty of fair representation.

2.     Discrimination

Massachusetts law prohibits a union from discriminating against its members based upon impermissible considerations.  Mass. Gen. Laws ch. 151B, § 4(2).  To establish a discrimination claim against a union in the absence of direct evidence of discrimination, the plaintiff must make a prima facie showing that "1) the plaintiff is a member of a protected class, 2) the union failed to pursue a grievance filed by the plaintiff and 3) there is some indication that the union's actions were motivated by discriminatory animus."  Casamento v. Mass. Bay Transp. Auth., 559 F. Supp. 2d 110, 118 (D. Mass. 2008), aff'd, 550 F.3d 163 (1st Cir. 2008).  If the plaintiff satisfies this burden, the burden of production then shifts to the union to demonstrate a legitimate, non-discriminatory reason for its action.  (Id.).  If the union is able to satisfy the burden of production,

the plaintiff must then offer evidence that the reason proffered was pretextual and hides a discriminatory motive.  Id.

    While it concedes that Crentsil is a member of a protected class, and that it did not advance his case to arbitration, SHARE argues that Crentsil has failed to make a prima facie showing of discrimination as he has not presented any evidence suggesting a discriminatory motive for SHARE's actions.  (Docket #41 at 13).  Crentsil attempts to prove SHARE's discriminatory bias with evidence of similarly situated comparators and the disparate treatment to which they were subject.  At his deposition, Crentsil testified that SHARE treated two white PCAs, Ashley Forget and Ashley Falkowski, in a more favorable manner than he was treated.  (Docket #43-1 at 207-08, 210; Docket #43-2 at 8).  However, the complaints against Forget and Falkowski were of a different nature than those asserted against Crentsil.  Forget was counseled by UMass Memorial in March of 2015 for attendance issues, and her employment was terminated in July of 2015 as a result of her failure to show up for work.  (SF 34, Docket #43-2 at 8).  Falkowski did receive a patient complaint, but this complaint asserted that she had discussed personal matters in the patient's presence.  (SF 32).  As a result, she was counseled by UMass Memorial management and reassigned to another patient.  (Docket #43-2 at 8).  Unlike the allegations against Crentsil, the activity for which Forget and Falkowski were disciplined was unrelated to patient safety, an issue of serious concern.  (SF 8).  I find that neither Forget nor Falkowski are valid comparators, and, therefore, I recommend that the Court find that Crentsil has failed to make a prima facie showing of discrimination.  I note that, even if these PCAs were valid comparators, Crentsil has presented no evidence of the steps that SHARE took on their behalf, thereby failing to show any differential treatment on SHARE's behalf.  (Docket #43-1 at 208).

C.      UMass Memorial

As an initial matter, UMass Memorial argues that, because Crentsil has not received a right to sue letter from the United States Equal Employment Opportunity Commission, it is entitled to summary judgment on Crentsil's federal discrimination and retaliation claims.  (Docket #47 at 10).  In his opposition, Crentsil, who initiated this suit in state court, clarifies that he does not seek to recover under Title VII and that his claims sound in state law.  (Docket #51 at 10).

1.      Discrimination

In count III of his amended complaint, Crentsil asserts that UMass Memorial discriminated against him on the basis of his race and national origin.  (Docket #1-1 at 5).  Massachusetts law prohibits "an employer, by himself or his agent, because of the race [or] national origin . . . of any individual . . .  to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]"  Mass. Gen. Laws ch. 151B, § 4(a).  To survive summary judgment on a claim brought under this provision, a plaintiff "must produce evidence from which a reasonable jury may infer 'four elements: membership in a protected class, harm, discriminatory animus, and causation.'"  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 474 Mass. 382, 396 (2016) (quoting Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001)).  "Because employees rarely can produce direct evidence of discriminatory animus and causation, they may survive a motion for summary judgment by producing 'indirect or circumstantial evidence of these elements using the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).'"  Id. (quoting Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 39-40 (2005)) (internal citation and alterations omitted).  At the first stage, the plaintiff bears the burden of establishing a prima facie case of discrimination; he must demonstrate that (1) he is a member of

a protected class; (2) he performed his job at an acceptable level; and (3) he was terminated or otherwise subject to an adverse employment action.  Id. at 396-97.  If the plaintiff can meet this burden, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision.  Id. at 397.  If this burden is met, the burden of production then shifts back to the employee to produce evidence that the employer's articulated justification for the adverse action is not true but a pretext.  Id.

Although UMass Memorial does not dispute that Crentsil is a member of a protected class or that he was terminated, it does argue that Crentsil has failed to establish a prima facie case of discrimination because he cannot show that he was performing his job at an acceptable level. (Docket #47 at 11-12).  UMass Memorial argues that Crentsil fails to meet this standard due to a long history of behavioral and performance problems while employed at UMass Memorial.  (Id. at 12).  As evidence, UMass Memorial first points to complaints against Crentsil in 2011 and 2012 and on June 20 and 21, 2015.  (Id. at 12).  However, the fact that UMass Memorial continued to employ Crentsil following these complaints belies its argument.  UMass Memorial also notes that Crentsil admitted at his deposition that he would "get pissed of bad" at patients, and argues that, because his job responsibility was to care for patients, this fact demonstrates that Crentsil was not performing his job at an acceptable level.  (Id. at 12).  I do not agree.  Crentsil did not testify that he outwardly manifested these feelings nor is there evidence that he ever informed his employers of these feelings.  (See Docket #48-1 at 31-32).  Finally, UMass Memorial argues that Crentsil's mistreatment of Patient Doe as well as his bullying of Schwartz demonstrate that he was not meeting UMass Memorial's legitimate job expectations.  (Docket #47 at 12-13).  However, Crentsil testified at his deposition that the complaints against him by Patient Doe were fabricated and that he never bullied Schwartz.  (Docket #43-1 at 52-54; Docket #48-1 at 49).  Because these

allegations are disputed, I will not consider them at this stage.  Therefore, I find that Crentsil has established a prima facie case of discrimination, and now turn to the second stage of the burden shifting paradigm.

UMass Memorial asserts that it terminated Crentsil after three nurses filed statements that Patient Doe had complained to them concerning Crentsil's care and a nurse complained that Crentsil had been condescending to a colleague and caused her to cry. (Docket #47 at 14). Certainly mistreatment of a patient on its own is a legitimate, non-discriminatory basis for termination.  See Sawyer v. Kindred Healthcare, Inc., 186 F. Supp. 3d 118, 124-25 (D. Mass. 2016) (holding that employer articulated a legitimate, nondiscriminatory reason sufficient to meet its burden of production at second stage of McDonnell Douglas analysis where employer contended it removed Director of Nursing Services because it wanted to institute zero tolerance policy for patient abuse and desired a culture change at the facility following an investigation that revealed significant shortcomings); Annobil v. Worcester Skilled Care Ctr. Inc., No. 11-40131-TSH, 2014 U.S. Dist. LEXIS 126643, at * 22 (D. Mass. Sept. 10, 2014) (holding that credible report that employee had abused patient established legitimate nondiscriminatory reason for employee's termination).  While Crentsil has testified that he did not mistreat Patient Doe and did not bully Schwartz, UMass Memorial need not persuade the court that it was correct in its claims about Crentsil's conduct in order to satisfy its burden.  See Bulwer v. Mount Auburn Hosp., 86 Mass. App. Ct. 316, 329 (2014) ("The defendant's burden of production is not onerous.  The reasons given for a[n] [employment] decision may be unsound or even absurd, and the action may appear arbitrary or unwise, nonetheless the defendant has fulfilled its obligation.  The defendant is not required to persuade the fact finder that it was correct in its belief.").  UMass Memorial need only show that it believed its stated reason for Crentsil's termination was credible.  See Espinal v. Nat'l

Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285, 292 (D. Mass. 2011) (emphasizing that a courts'
focus at this stage "must be on the perception of the decision maker, that is, whether the employer
believed its stated reason to be credible) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 924
(1st Cir. 1991).  Here, UMass Memorial investigated the complaints, interviewed Patient Doe and
found him credible, and interviewed Crentsil before terminating Crentsil's employment.  I find
that UMass Memorial has met its burden of production at the second stage of the burden shifting
paradigm and turn my attention to the third stage.

Because Massachusetts is a pretext only jurisdiction, "an employee may survive summary
judgment by producing evidence 'that the respondent's facially proper reasons given for its action
against him were not the real reasons for that action,' even if that evidence does not show directly
that the true reasons were, in fact, discriminatory."  Verdrager, 474 Mass. at 397 (quoting
Wheelock Coll. v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 139 (1976)) (alterations
omitted).  Crentsil asserts that UMass Memorial as well as its nurses are mandated reporters and
were required by law to report Crentsil's alleged mistreatment of Patient Doe to appropriate
agencies.  (Docket #51 at 5-6).  Crentsil argues that their failure to do so demonstrates that the
alleged mistreatment was not the real reason for his termination.  (Id.).  In support of this argument,
Crentsil cites to Mass. Gen. Laws ch. 19A, § 15, which requires nurses and others who have
reasonable cause to believe that an elderly person is suffering from abuse to report it to the
Department of Elder Affairs.[6]  An "elderly person" is defined as "an individual who is sixty years

---

[6] Crentsil also cites to chapter 155.000 of title 105 of the Massachusetts Administrative Code and Mass. Gen. Laws
Ch. 11, § 71 in support of his argument; however, these provisions are not applicable to UMass Memorial or its
employees. (Docket #51 at 5-6). Chapter 155.000 "sets forth standards for the prevention, reporting, and investigation
of patient and resident abuse, neglect, and mistreatment, and the misappropriation of patient and resident property by
individuals working in or employed by a facility, home health agency, homemaker agency or hospice program[.]"
105 CMR 155.001.  It applies only to "long term care facilities subject to licensing under Mass. Gen. Laws ch. 111,
§ 71, hospice programs licensed under Mass. Gen. Laws ch. 111, §§ 57D or 51, and home health agencies and
homemaker agencies," and hence does not cover UMass Memorial.  See 105 CMR 155.002.  Likewise, Mass. Gen.
Law ch. 111, § 72G mandates reporting of suspected abuse but limits its application to these same entities.

of age or over." Mass. Gen. Laws ch. 19A, § 14. At the time of the alleged abuse, Patient Doe was sixty-eight years old, (Docket #48-1 at 73), and thus qualifies as an "elderly person." "Abuse" is defined under the statute, in relevant part, as "an Act or omission which results in serious physical or emotional injury to an elderly person." Mass. Gen. Laws ch. 19A, § 14. Chapter 5.02 of title 651 of the Massachusetts Administrative Code clarifies that the infliction of both serious physical and emotional injury must be intentional in order to require a report. Following his termination, Crentsil was advised by SHARE that UMass Memorial had not reported the alleged mistreatment to state officials because he had not been accused of intentional abuse. (Docket #44 at 6). Thus, the fact that neither UMass Memorial nor its employees reported the alleged mistreatment to state officials does not establish that UMass Memorial's asserted reason for Crentsil's termination was not the real reason for his termination.

Because Crentsil has failed to produce evidence that UMass Memorial's articulated justification for his termination is not true but a pretext, I recommend that UMass Memorial be granted summary judgment with respect to count III of Crentsil's amended complaint.

2.     Retaliation

In count II of his amended complaint, Crenstil asserts that UMass Memorial targeted him for adverse employment actions, resulting in his termination, due to a complaint he filed against Budnick alleging racial discrimination on August 21, 2014. (Docket #1-1 at 5). In his opposition to the motions for summary judgment, Crentsil elaborates on this assertion. Crentsil argues that Budnick collaborated with other nurses to fabricate stories of abuse by Crentsil in order to get Crentsil dismissed as revenge for his complaint of racism against her. (Docket #51 at 10-11).

To survive summary judgment on a claim of retaliation, an employee must produce evidence from which a factfinder could infer four elements: (1) "that the employee reasonably

20

and in good faith believed that the employer was engaged in wrongful discrimination;" (2) "that the employee acted reasonably in response to that belief through reasonable acts meant to protest or oppose discrimination;" (3) "that the employer took adverse action against the employee;" and (4) "that the adverse action was a response to the employee's protected activity (forbidden motive)." Verdrager, 474 Mass. at 405-06 (quotations and citations omitted). Because employees alleging retaliation often do not possess direct evidence of the fourth element, they may prove forbidden motive with indirect evidence, which courts evaluate using a three-stage burden shifting paradigm. Id. at 406. At the first stage, the employee bears the burden of demonstrating a prima facie case of retaliation; he "must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action." Thompson v. Coca-Cola Co., 522 F.3d 168, 181 (1st Cir. 2008). "At the second stage, the 'employer must then articulate a legitimate nondiscriminatory reason for' the adverse employment decision." Verdrager, 474 Mass. at 406 (quoting Esler v. Sylvia-Reardon, 473 Mass. 775, 780 n.7 (2016)). At the third stage, the employee must produce evidence that the employer's stated reason was a pretext for retaliating against the employee due to his protected activity. Id. UMass Memorial argues that there is neither direct evidence of a forbidden motive on its part nor can Crentsil establish a causal link between his protected activity and his termination. (Docket #47 at 16-18)

At the hearing, Crentsil's counsel represented that Crentsil had testified at his deposition that, following his complaint against Budnick, she had approached him and said would get back at him for making the complaint.[7]  I asked Crentsil's counsel where I could find this testimony in

---

[7] In his opposition to the motions for summary judgment, Crentsil also asserts that, following his complaint against her, Budnick confronted him and told him that she would ensure she took revenge against Crentsil for reporting her. (Docket #51 at 5).  Crentsil provided no citation for this allegation nor did he assert that he testified to this statement. (See id.).

the record.  He was unable to give me a citation at the hearing, but I gave him leave to file a statement directing me to this evidence.  On August 2, 2017, Crentsil filed a single page of deposition transcript.  (Docket #60).  This excerpt has absolutely no bearing on the issue of UMass Memorial's alleged retaliation; the testimony relates only to Crentsil's union representation prior to his termination.  Nor is there any direct evidence that Budnick collaborated with other nurses in retaliation against Crentsil.  This allegation is complete conjecture.  Hence, I find that Crentsil has produced no direct evidence of a forbidden motive and proceed to address whether he has established such with indirect evidence.

UMass Memorial argues that Crentsil has failed to establish a prima facie case of retaliation as he can show no causal link between his complaint against Budnick and his termination.  (Docket #47 at 17).  "Where adverse employment actions follow close on the heels of protected activity, a causal relationship may be inferred.  However, as the elapsed time between those two events becomes greater, the inference weakens and eventually collapses."  Mole v. Univ. of Mass., 442 Mass. 582, 595 (2004).  "On a claim of retaliatory discharge, 'unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."  Id. (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)) (emphasis in the original).  "Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004).  Crentsil made his complaint against Budnick on September 14, 2015 with an effective date of August 21, 2014.  He was terminated on August 20, 2015.  Thus, Crentsil cannot rely on temporal proximity alone to establish a prima facie case.  But temporal proximity is only one method of proving retaliation; "[e]vidence of discriminatory or disparate treatment in the time period between the protected

activity and the adverse employment action can be sufficient to show a causal connection." Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003).  Even assuming that the complaints made against Crentsil by Budnick and the other nurses were both false and collaborative, the first complaint was made by Budnick on June 20, 2015 and thus is too temporally distant to establish a causal connection.  See Calero-Cerezo, 355 F.3d at 25.  Nor do I find that Crentsil has produced any evidence of disparate conduct.  See supra, § III.B.2.  Thus, I find that Crentsil has failed to establish a prima facie case of retaliation.[8]

Because Crentsil has failed to produce evidence of a causal connection between his protected activity and his termination, I recommend that UMass Memorial be granted summary judgment as to count II of Crenstil's amended complaint.

---

[8] I also note that, for the same reasons as those discussed above, see supra, § III.C.1, Crenstil has failed to establish that UMass Memorial's articulated justification for his termination is not true but a pretext.  Summary judgment on Crenstil's retaliation claim is also appropriate on this ground.

IV.      CONCLUSION

For the foregoing reasons, I RECOMMEND that the motion for summary judgment filed by SHARE (Docket #40) be ALLOWED and the motion for summary judgment filed by UMass Memorial (Docket #46) be ALLOWED, and ORDER that UMass Memorial's motion to strike (Docket #56) be ALLOWED to the extent described in this order.[9]


                              /s/ David H. Hennessy
                              David H. Hennessy
                              United States Magistrate Judge

---

[9] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).